**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **ELEANOR FULGENZI** | * | Civil Action No.: 5:09-CV-1767 |
| Plaintiff | * | Judge Sara Lioi |
| v. | * | Magistrate Judge Benita Pearson |
| **WYETH, INC.**, et al. | * | |
| Defendant | * | |

\* \* \* \* \* \* \*

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S RESPONSE TO DEFENDANT, ACTAVIS, INC.'S AND ACTAVIS-
ELIZABETH, LLC'S MOTION TO DISMISS
BASED ON FEDERAL PRE-EMPTION**

**I.    INTRODUCTION AND COUNTER TO SUMMARY OF THE ARGUMENT**

Plaintiff, Eleanor Fulgenzi developed Tardive Dyskinesia and Akathisia, serious neurological disorders that cause involuntary and uncontrollable movements of the head, neck, face and other body parts in addition to grotesque facial grimacing as well as uncontrollable tongue movements, as a result of her use of metoclopramide, the generic version of the prescription drug, Reglan.

Contrary to the assertions of Defendants, Actavis, Inc. and Actavis-Elizabeth, LLC [hereinafter, collectively, "Actavis"], plaintiff's claims are not pre-empted by the

1

Hatch-Waxman Amendments to the Federal Food, Drug and Cosmetic Act [hereinafter, "FDCA"]. Immunization of generic drug manufacturers, such as Actavis, from valid state law claims and lawsuits is not expressly, or even impliedly, provided for in any law; was not intended by Congress; and runs contrary to public policy.

The issue presented is simple: Does the regulatory framework governing the manufacture and marketing of generic drugs *prohibit* a manufacturer from discharging its duty under state law, including Ohio state law, to conduct postmarketing pharmacovigilance regarding its products, and from taking appropriate action when it knew, or should have known, of risks associated with its product? The answer to this question is "no." In the absence of any prohibition, there is no conflict between state and federal law, and Actavis's Motion must be denied.

Although Actavis's arguments must fail regardless of the recent Supreme Court Decision in *Wyeth v. Levine* (2009), 129 S.Ct. 1187, Plaintiff notes that, contrary to the arguments of Actavis at pages 21 – 24 of its Memorandum in support of its Motion to Dismiss, the Courts have routinely rejected the "generic preemption" argument in cases decided after the Supreme Court handed down the *Wyeth* decision. *See*, *Bartlett v. Mutual Pharmaceutical Co., Inc.* (9-30-09), 08-CV-358, copy attached as Exhibit; *Stacel v. Teva Pharms., USA*, 620 F. Supp. 2d 899 (N.D. Ill. 2009); *Schrock v. Wyeth, Inc.*, 601 F. Supp. 2d 1262 (W.D. Okla. 2009); *see*, *also, Kellogg v. Wyeth*, 612 F. Supp. 2d 421 (D. Vt. 2008); *Demahy v. Wyeth, Inc.*, 586 F. Supp. 2d 642 (E.D. La. 2008).

## II. LAW AND ARGUMENT

### A. STANDARD FOR MOTION TO DISMISS

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a plausible claim for relief. *Bell Atlantic v. Twombly,* --- U.S. ---, ---- - ----, 127 S. Ct. 1955, 1965-66, 167 L.Ed.2d 929 (2007); Fed.R.Civ.P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is improbable that a plaintiff would be able to prove those facts, and even if the possibility of recovery is extremely remote and unlikely. *Twombly,* 127 S.Ct. at 1965 (citations and quotations omitted). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and constue them in the light most favorable to the plaintiff. *See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp.,* S.A., 711 F.2d 989, 994-95 (11th Cir. 1983); *see also Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (nothing that at the pleading stage, the plaintiff "receives the benefit of imagination"). Generally, notice pleading is all that is required for a valid complaint. *See Lombard's Inc. v. Prince Mfg., Inc.,* 753 F.2d 974, 975 (11th Cir. 1985), cert. denied, 474 U.S. 1082, 106 S. Ct. 851, 88 L.Ed.2d 892 (1986). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See Erickson v. Pardus,* ---U.S. ----, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (*citing Twombly,* 127 S.Ct. at 1964).

Although labeled a "Motion to Dismiss," Actavis has asked the Court to consider a wide variety of materials outside the pleadings, including an FDA Policy and Procedure Guide (Ex. 12) and various FDA Guidances (Exs. 13 - 16) as well as "Proposed Rules"

of the FDA not yet codified in its regulatory scheme. While these materials offer FDA's gloss on the regulatory scheme applicable to prescription drugs, they are not the law. These materials also do not have the effect of relieving drug manufacturers from their obligations under state law.

In light of the fact that Actavis has requested that the Court consider these materials, plaintiff would ask that it similarly consider materials submitted herein. Plaintiff concedes that evidence of the sort is typically inappropriate when considering a motion to dismiss. However, when matters outside the pleadings are presented to the district court in a Fed.R.Civ.P. 12(b)(6) motion to dismiss, and the district court considers these additional facts, the motion is to be converted into a motion for summary judgment as provided in Fed. R. Civ.P. 56, and all parties must be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. Fed.R.Civ.P. 12(b); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1371 (11th Cir. 1997).

        **B.    PLAINTIFF'S CLAIMS ARE NOT PREEMPTED BY THE HATCH-WAXMAN AMENDMENTS**

Actavis's motion makes clear that the issue to be decided here is whether the Hatch-Waxman Amendments preempt plaintiff's claims. Preemption analyses are inherently fact driven. "Preemption is not a doctrine that lends itself to a black- letter rule. One size does not fit all. The decisions must be based on the circumstances presented in the particular situation." *Colacicco v. Apotex Inc.,* 521 F.3d 253, 256 (3d Cir. 2008). Courts are especially careful not to interpret Congressional intent to encroach on state sovereignty in those matters traditionally relegated to the states' police powers, such as health and safety regulation, unless that was the clear and manifest intent of Congress. *See New York State Conference of Blue Cross & Blue Shield Plans v.*

*Travelers Ins. Co.,* 514 U.S. 645, 665, 115 S.Ct. 1671, U.S.N.Y. 1995; *Hillsborough County v. Automated Med. Labs., Inc.,* 471 U.S. 707, 715-718 (1985) (finding that the mere comprehensiveness of FDA regulatory scheme did not support preemption and that states were not preempted in identifying additional needs and placing further requirements regarding plasma injections); *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 756, 105 S.Ct. 2380, U.S., 1985; *Goodlin v. Medtronic, Inc.,* 167 F.3d 1367, 1371-2 (11th Cir. 1999). "The States traditionally have had great latitude under their police powers to legislate as 'to the protection of the lives, limbs, health, comfort, and quite of all persons.'" *NY State Conf. Of Blue Cross & Blue Shield Plans,* 514 U.S. at 665.

The Supreme Court has identified three major situations where there is preemption: 1) "express" preemption, applicable when Congress expressly states its intent to preempt state law; 2) "field" preemption, applicable when "Congress' intent to pre-empt all state law in a particular area may be inferred [because] the scheme of federal regulation is sufficiently comprehensive" or " 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject;'" and 3) "conflict" preemption, applicable when "state law is nullified to the extent that it actually conflicts with federal law," even though Congress has not displaced all state law in a given area. *Hillsborough County,* 471 U.S. at 713.

Actavis does not appear to argue that "express" or "field preemption is applicable. As such, the sole issue is whether plaintiff's claims conflict with the federal regulations governing the manufacture and marketing of generic drugs. A conflict between state and federal law "arises when compliance with both federal and state regulations is a physical

5

impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives o Congress." *Hillsborough County,* 471 U.S. at 713; *see* also *City of New York v. F.C.C,* 486 U.S. 57, 64, 108 S.Ct. 1637, U.S. Dist.Col, 1988.  ("The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof.")

      Actual conflicts between federal and state law are, decidedly, the exception as opposed to the rule.  As one court has observed, "[t]here are not many examples of instances where it is *impossible* to comply with both federal and state law, presumably because state legislatures and regulators do not readily seek confrontation with federal authority." *Colacicco,* 521 F.3d at 266.  (emphasis added.)  Indeed, "[t]he scarcity of actual conflict cases has led the [Supreme Court] to pose hypothetical conflicts."  One instructive example:  *In Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 143, 83 St.Ct. 1210, 10 L.Ed.2d 248 (1963), in which the Supreme Court, to demonstrate the "physical impossibility" inherent in conflict preemption, hypothesized the existence of squarely contradictory federal and state statutes.  In this hypothetical, "federal orders forbade the picking and marketing of any avocado testing more than 7% oil, while the [state] test excluded from the State any avocado measuring less than 8% oil content." *Id.* Plainly, as the *Colacicco* court concluded, "[u]nder those circumstances, it would be a 'physical impossibility' for avocado growers to comply with both federal and state law because California law would require them to do what federal law forbade, that is, pick their avocados after they are surpassed the 7% ceiling established by federal law." *Colacicoo,* 521 F.3d at 266.

The key to ascertaining whether an actual conflict exists was expressed pointedly by Justice Beyer. To determine whether an 'impossibility situation' obtains, the court should ask "…whether or not the Federal and State Statutes are in 'irreconcilable conflict,' such that they 'impose directly conflicting duties.'" For example, "if the federal law said, 'you must sell insurance,' while the state law said, 'you may not'" *Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996).

Thus, there are two issues for the Court to determine: 1) what are the duties imposed on Actavis by federal and state law, respectively; and 2) are these duties in irreconcilable conflict, such that they impose directly conflicting duties.

### 1.    Duties Imposed on Actavis Under the Federal Regulatory Scheme

Actavis correctly observes that, pursuant to the Hatch-Waxman Amendments to the FDCA, it was relieved from the responsibility of performing *premarketing* studies before gaining approval to market its version generic Reglan (metoclopramide). Actavis is also correct that, as the sponsor of an Abbreviated New Drug Application ("ANDA"), it was required to prove that its generic Reglan was the "same as" the brand name drug, in design and labeling. *See* 21 U.S.C. §355(j); 21 C.F.R. §314.92(a)(1)

But of course, premarketing activities are only half of the story. The safety profile of a prescription drug continues to emerge after approval. Indeed, this is why all pharmaceutical companies are required to monitor postmarketing events. *See* 21 CFR §§314.80, 314.98. Under regulations, drug manufacturers have continuing obligations to report adverse drug experiences, *id.* § 314.80(c), and any "significant new information …

7

that might affect the safety, effectiveness, or labeling of the drug product," *id.* § 314.81(b)(2)(i). Failure to abide by these obligations may result in withdrawal of an approved drug. *Id.* § § 314.80(j), 314.81(d); *Colacicco,* 521 F.3d at 259-260. Thus, contrary to what Actavis would have the Court believe, generic manufacturers are not paralyzed to the point of inaction with respect to warning of risks it learns after the approval of its ANDA. "After approval of an ANDA, if an ANDA holder believes the new safety information should be added, it should provide adequate supporting information to FDA, and FDA will determine whether the labeling for the generic and listed drugs should be revised." *Colacicco v. Apotex, Inc.,* 432 F. Supp.2d 514, 528 (E.D. Pa. 2006); *see also* FDA comments, 57 Fed.Reg. 17950 at 17961 (April 28, 1992).

Some courts in fact have ruled that a generic manufacturer can change the label for its drug without prior approval of FDA. In *Foster v. Am. Home Prods. Corp.,* 29 F.3d 165 (4th Cir. 1994), the court wrote that: "…manufacturers of generic drugs approved pursuant to ADNAs may alter a drug's labeling '[t]o add or strengthen a contraindication, warning, precaution or adverse reaction' or [t]o delete false, misleading or unsupported indications for use or claims for the effectiveness' without prior FDA approval." *Foster,* 29 F.3d at 169, *citing to* 21 C.F.R. § § 314.70(c)(2), 314.97(1993).

Moreover, while Actavis excused itself from making any effort to stay current with the scientific knowledge of the risks of Reglan, its ignorance of this information is not a defense. "In cases involving product alleged to be defective due to inadequate warning, 'the manufacturer is held to the knowledge and skill of an expert… The manufacturer's status as expert means that at a minimum he must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is

8

imparted thereby.'" *Foster,* 29 F.3d at 169-170, *quoting Borel v. Fibreboard Paper Prods. Corp.,* 493 F.2d 1076, 1098 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).

Actavis's notion that, in exempting generic manufacturers from repeating premarketing studies, the Hatch-Waxman Amendments somehow serves to immunize those same manufacturers from liability for ignoring evidence of risk and failing to take steps to ensure the safety of their products is not support by any authority. As the *Foster* court observed:

> The statutory scheme governing premarketing approval for drugs simply does not evidence Congressional intent to insulate generic drug manufacturers from liability for misrepresentations made regarding their products, or to otherwise alter state products liability law. Manufacturers of generic drugs, like all other manufacturers, are responsible for the representations they make regarding their products.

*Foster,* 29 F.3d at 170

### 2. Postmarketing Safety Surveillance is Critically Important, Even with Generic Drugs

Contrary to Actavis's brief discussion of the issue, generic manufacturers are not released from the obligation to perform postmarketing safety surveillance. In fact, the case law and FDA make it clear that all manufacturers, including those of generic drugs, have an obligation to take steps to ensure the safety of their products and to conduct appropriate pharmacovigilance.

Indeed, a generic manufacturer can add or strengthen label warnings without prior FDA approval. 21 C.F.R. § 314.70(c), which is applicable to both brand name and generic drug manufacturers, authorize manufacturers to make "Moderate Changes" to their labels upon notification to the FDA through a Changes Being Effected ("CBE")

9

Supplement. Normally, label changes to strengthen warnings are handled through this process.

This regulation, permitting manufacturers to strengthen label warnings unilaterally, applies to all "approved application[s]," 21 C.F.R. § 314.70(a), and does not except or exempt manufacturers of generic drugs. *See*, *e.g.*, *Foster*, *supra*, at 170. Indeed, a separate regulation, 21 C.F.R. § 314.97, *directs* generic manufacturers to comply with section 314.70 "regarding the submission of supplemental applications and other changes to an approved abbreviated application."

Beginning in June 2002, with Congress's reauthorization of the Prescription Drug User Free Act, FDA began the development of comprehensive guidelines for risk management of drug products. *See* Guidance for Industry, Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment, FDA Center for Drug Evaluation and Research, March 2005, p. 2, Ex. 1. FDA issued three concept papers, each focused on one aspect of risk management, including 1) premarketing risk assessment, 2) development and implementation of risk minimization tools, and 3) postmarketing pharmacovigilance and pharmacoepidemiologic assessments. *See id.* After a lengthy comment period, and a public workshop to discuss the concept papers, FDA published three guidances:

1. Premarketing Risk Assessment (Premarketing Guidance)

2. Development and Use of Risk Minimization Action Plans (RiskMAP Guidance)

3. Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment (Pharmacovigilance Guidance). *Id.*

FDA makes plain the distinction between premarketing and postmarketing risk assessment, explaining how each is important. The notion that a drug is somehow safe merely because it has been on the market a number of years, or because it is available in generic formulation, is expressly rejected by FDA:

> …risk assessment and risk minimization form what FDA calls risk management. Specifically, risk management is an iterative process of 1) assessing a product's benefit-risk balance, 2) developing and implementing tools to minimize its risk while preserving its benefits, 3) evaluating tool effectiveness and reassessing the benefit-risk balance, and 4) making adjustments, as appropriate, to the risk minimization tools to further improve the benefit-risk balance. *This fourpart process should be continuous throughout a product's lifecycle, with the results of risk assessment informing the sponsor's decisions regarding risk minimization.*

*Id. (*emphasis added)

Throughout the pharmacovigilance guidance, FDA offers examples of ways in which manufacturers can work to ensure the safety of their products. The first line of defense involves the receipt and review of reports of adverse experiences in association with the manufacturer's drug. *Id.* at 4. This function is critical because "[i]t is possible that even a single well-documented case report can be viewed as a [safety] signal [that may warrant more investigation], particularly if the report describes a positive rechallenge or if the event is extremely rare in the absence of drug use." *Id.*

In response to case reports of this type, FDA recommends that sponsors make an effort to identify additional cases, by searching the published literature and FDA's AERS database, by using thorough search strategies based on appropriate coding terminology. *Id.* at 6. At the same time, sponsors are cautioned against routinely excluding confounded cases (or cases with possible etiologies other than the product of concern), as these could still represent adverse effects of the product under review. *See*

11

Pharmacovigilance Guidance at 7, Ex.1. Indeed, the FDA cautions sponsors that, for spontaneously reported events, it is not possible to identify all cases because of under-reporting. Indeed, it is well known that "[t]he AERS…has been criticized because only 1 to 10 percent of serious adverse events are actually reported, limiting the database's usefulness for identifying emerging drug hazards."

Additional activities of postmarketing safety surveillance are set forth in the Guidance, including using data-mining techniques to investigate adverse event reports, initiating registries or surveys to better track post-approval safety of a drug, and designing and conducting pharmacoepidemiologic safety studies. *See* Pharmacovigilance Guidance at 12, 15, 16, Ex. 1. It may be gleaned from Actavis's arguments in its Motion to Dismiss that Actavis conducted none of these activities, perhaps because the company regards the Guidance as a collection of suggestions, not applicable to generic manufacturers; through the plain language of document implicate generic Reglan: "[T]his guidance uses the term product or drug to refer to all products (excluding blood and blood components) regulated by [FDA's] Center for Drug Evaluation and Research…" *See id.,* at 1, n.2. Moreover, there is no regulation which suggests that the Guidance does not apply equally to branded and generic drugs, and no suggestions in the Guidance that it does not apply with equal force to generic drugs. Indeed, the clear implication, based on FDA's statement that risk assessment "should be continuous throughout a product's lifecycle," is that good pharmacovigilance practices apply to all drug manufacturers. *Id,* at 2.

Most critically, with respect to the issue of whether plaintiff's claims are preempted by regulations applicable to generic manufacturers, there is no regulation

which *prevents* Actavis from carrying out any of the pharmacovigilance recommendations found in the guidance. As such, there is no conflict between the duty under the regulations (to use the label until such time as FDA agrees to change) and the duty under state law (that a drug manufacturer is responsible for its product and has a duty to warn of risks that were known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution.

Indeed, under Ohio law, the learned intermediary doctrine does not relieve the manufacturer of liability to the ultimate user of an ethical (i.e., prescription) drug for an inadequate or misleading label. *See, Tracy v. Merrell Dow Pharmaceuticals, Inc.* (1991), 58 Ohio St.3d 147, 149 – 150. In fact, a drug manufacturer may be held strictly liable for injuries caused by a drug where the manufacturer has failed to provide an adequate warning. *See*, *Seley v. G.D. Searle & Co.* (1981), 67 Ohio St.2d 192, at syllabus. A warning is adequate where, under all the circumstances, it reasonably discloses to the medical professional all known or reasonably discoverable risks inherent in the use of the drug. *Id.*, at 198. Moreover, a reasonable warning should convey both the nature of the dangers involved and the intensity of the risk. *Id.* Finally, a drug manufacturer may not ignore or discount scientific or medical evidence tending to show that a certain danger is associated with use of the drug solely because the manufacturer finds the information unconvincing. *Id*.

This language demonstrates that the manufacturer of drugs must continue to monitor the safety of its product and realizes that the drug maker is in the best position to do so. In fact, the United States Fourth District Court of Appeals recognizes that the

13

generic manufacturer is certainly not prohibited from conducting an independent investigation, and is at risk should it choose not to do so:

> We do not accept the assertion that a generic manufacturer is not responsible for negligent misrepresentations on its product labels if it did not initially formulate the warnings and representations itself. When a generic manufacturer adopts a name brand manufacturer's warnings and representations without independent investigation, it does so at the risk that such warnings and representations may be flawed. *Foster*, at 171.

The fact that Hatch-Waxman removed the obligation to repeat premarketing studies does nothing to change the drug maker's obligation to conduct proper and adequate postmarketing studies. There is simply no evidence of "Congressional intent to insulate generic manufacturers from liability for misrepresentations made about their products, or to otherwise alter state products liability law." *Foster*, 29 F.3d at 170; *see also* 21 CFR § 314.70(c)(6).

### 3. Recent Cases Finding That the Hatch-Waxman Amendments Preempt State Law Claims Cases Are Distinguished from the Case at Bar

Four recent cases have addressed the issue of whether the Hatch-Waxman Amendments preempt state law claims brought against a manufacturer of a generic drug (*Colacicco, Mensing, Masterson*, all cited *supra*, and *Gaeta v. Perrigo Pharmaceuticals Company,*---F.Supp.2d---, 2008 WL 2548813 (N.D.Cal. June 13, 2008)). While the holdings in all four cases were that state law claims were preempted by federal regulations, each of these is distinguished from the instant case.

In *Colacicco*, plaintiffs sued defendants for failure to warn of the increased dangers of suicide in patients taking Paxil and its generic equivalents. *See Colacicco*, 521 F.3d at 256. Plaintiff alleged that a scientific basis existed which mandated a label change. *See id*. At 269. The court's holding turned on the fact that FDA had specifically

14

considered the basis proposed by plaintiffs, and repeatedly rejected any label change. *Id*. As such, the "state-law obligation to include a warning asserting the existence of an association between [Paxil] and suicidality directly conflicts with the FDA's oft-repeated conclusion that the evidence did not support such an association." *Id*. At 271. But, critically, the court limited the holding to cases in which "the FDA has publicly rejected the need for a warning that plaintiffs argue state law requires." *Id*. At 272-273.

The *Gaeta* court followed *Colacicco's* reasoning in lock step, concluding that state law claims against a generic manufacturer of an over-the-counter ("OTC") drug were preempted because the FDA had once rejected a warning as to the drug at issue. *Gaeta*, 2008 WL 2548813.

Actavis also cites *Mensing* and *Masterson* in support of their Motion to Dismiss. Plaintiff notes that *Mensing*, though also addressing metoclopramide, erroneously found that the generic manufacturer may not gain approval of a requested label change. In short, the Court in *Mensing* opined that it would have to engage in speculation as to a generic manufacturer's requested label change: "The outcome of any such request to make a revision is uncertain and would require speculation as to what the FDA might have done." *Id*., at \*17. Plaintiffs would also note that the *Mensing* decision was decided before *Wyeth v. Levine* and is currently on appeal to the United States 8th Circuit Court of Appeals.

The same element of speculation (that is, what would the FDA have done if a defendant generic manufacturer had conducted pharmacovigilance and contacted the agency about safety concerns, or proposed a label change) was considered by the court in the *Masterson* case. In the end, not wanting to engage in speculation about potential

15

FDA action, the court followed the analysis from *Mensing* and found that the failure to warn claims were preempted. *See Masterson*, 2008 WL 3262690 at *4.

To the contrary, as stated in the introduction of this pleading, after the United Supreme Court decision in *Wyeth v. Levine, supra,* the Courts have consistently held that claims against generic manufacturers are not preempted. *See*, *Bartlett v. Mutual Pharmaceutical Co., Inc.* (9-30-09), 08-CV-358; *Stacel v. Teva Pharms., USA*, 620 F. Supp. 2d 899 (N.D. Ill. 2009); *Schrock v. Wyeth, Inc.*, 601 F. Supp. 2d 1262 (W.D. Okla. 2009).

### C. A GENERIC MANUFACTURE CAN EMPLOY OTHER MEANS TO WARN OF ITS PRODUCT'S RISKS

Even if this Court were to conclude that Actavis could not have invoked the CBE process to strengthen their metoclopramide warnings, preemption would still not be appropriate because Actavis had other means to warn of their products' risks. First, there is no dispute that generic drug manufacturers could have sought to strengthen their warnings about the risks of tardive dyskinesia caused by prolonged exposure to metoclopramide through the prior approval supplement process, 21 C.F.R. § 314.70(b), but chose not to do so.

In turn, even before FDA approval for a labeling change was obtained, Actavis was free to employ other means to warn health care professionals and consumers of the increased risk of tardive dyskinsia from prolonged exposure to metoclopramide. When the agency originally promulgated its labeling regulations it made clear that the labeling requirements did not prohibit the manufacturer from warning health care professionals of possibly harmful adverse effects when discovered via what are commonly referred to as "Dear Doctor" letters. 44 Fed. Reg. 37434, 37447 (June 26, 1979).

Accordingly, even if this Court were to somehow find that Actavis was barred from strengthening its label through the CBE or other means, Plaintiff's claims are not barred against this generic manufacturer because it had other means to warn of the risks of metoclopramide.

**Conclusion**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Actavis's Motion to Dismiss.

/s/  Richard W. Schulte

Richard W. Schulte (0066031)
Behnke, Martin & Schulte, LLC.
131 North Ludlow Street
Suite 840
Dayton, Ohio 45402
Tel.: 937-435-9999
Fax: 937-435-7511
rschulte@legaldayton.com

Patrice Denman
Patrice F. Denman Co., L.P.A.
1111 Mentor Avenue
Painesville, Ohio  44077
Tel.: 440.639.1020
Fax: 440.352.4499
patricedenman@sbcglobal.net
*Of Counsel*

## **CERTIFICATE OF SERVICE**

      I certify that on November 18, 2009, a true and accurate copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system and served by electronic and/or ordinary mail upon the following on this date:

| | |
|---|---|
| Mark Herrmann<br>JONES DAY<br>77 West Wacker Drive<br>Chicago, Illnois  60601-1692 | Richard A. Dean<br>Kristen L. Mayer<br>TUCKER ELLIS & WEST, LLP<br>925 Euclid Avenue, Suite 1150<br>Cleveland, Ohio  44115-1414 |
| David Booth Alden<br>JONES DAY<br>North Point, 901 Lakeside Avenue<br>Cleveland, Ohio  44114 | |
| Henninger S. Bullock<br>MAYER BROWN, LLP<br>1675 Broadway<br>19th Floor<br>New York, New York 10019 | |

                                                /s/ Richard W. Schute
                                                An Attorney for Plaintiff